So we'll turn now to the day calendar. If we could hear first from the parties in the United States v. Khusenov. Nicholas Kaiser on behalf of Dilshad Khusenov. Good morning, judges. Mr. Khusenov, 32 years old, a lawful permanent resident, was arrested on August 31, 2017. He's been detained since, charged with conspiracy and attempt to support a foreign terrorist organization for his role in forwarding $2,400 to a fellow Uzbek emigre who forwarded that $2,400 to another person who attempted to go to Syria but was arrested at JFK airport. Mr. Khusenov has been detained. We're here today. Is he detained here in the Southern District? He is. He was arrested in Chicago and transported and he's been in the MDC since November or December. We had a bail appearance in the district court in January. The court treated the rebuttable presumption and the charges in this case under 2239B as an abject bar to bail. I'm not sure how you can say that. I mean, certainly the district court gave it considerable weight, but it went on to analyze the other factors. It didn't, Judge. It mentioned the other factors. It listed the 3142 factors. It stated what 3142 said but didn't give one word to the history and characteristics, the sureties, anything that might ameliorate the risk of his being . . . I didn't say it didn't say one word. It actually complimented the fact that your client was able to come up with such sureties. So, I mean, I don't see that as anything other than a circumstance where the district court recognized that he had sureties. They were able to come forward. It didn't identify any problem with the sureties, but it thought it was outweighed by the seriousness of the offense and the motive to flee. He also . . . he acknowledged reviewing all the materials and those included the defense submission about the defendant's personal history. So, we usually take the district court at its word when it says that it has reviewed materials that are relevant to a decision. Am I missing something here? I'd say based on the weight of what was addressed in that 20-page or 30-page opinion, that dictated opinion that was dictated on the record. I think we missed something because the pretrial services reports on the six sureties were handed up to the court, and it's noted on the record at page 18. I've received these 30 seconds before taking the bench, and those reports didn't factor into the opinion one way. The court didn't mention the pretrial services reports. For all we know, the sureties could have been the attorney general, and the court wouldn't have known that, or they could have been employed by the attorney general, for all we know. The client has no criminal record? No criminal record. Been working . . . Is his wife . . . and he's been working for how long? Ten years as a truck driver. Is his wife a U.S. citizen? Lawful permanent resident. His three children under 10 are citizens. They're all U.S. citizens? Yes. Okay, and did the . . . and all the pretrial services personnel who looked at this recommended bail? The pretrial services in Chicago recommended bail, and there were two pretrial recommendations here in the Eastern District. In addition, we made the sureties available to the government, to the FBI, and to the U.S. attorney to interview. And the amount of that surety was what? It was a $500,000 personal recognizance bond signed by six financially responsible persons. And who were they? They were Mr. Kusinov's friends and family, his brother-in-law, all truck drivers in his community in Chicago, some earning over $100,000 a year. One was his brother-in-law, earning over $100,000 a year, who've known him for over 10 years. They were willing to put their lives on the line based on their belief that he wouldn't flee, he would come back to court, and he wouldn't pose a danger to the community. He surrendered his passport and electronic monitoring? We recommended electronic home monitoring, as did pretrial services. Okay. Did the family surrender their passports? They hadn't, but they'd be willing to do that, of course. And there are conditions. I mean, this court, the district court, didn't address any conditions which might ameliorate any of the government's concerns. As in Your Honor's ruling in Sabhanini, which reversed a district court finding that the court failed to address any concerns the government might have. Here there was no- Here the government conceded that there were conditions that could allow the defendants to be released. The government conceded that. I don't know that there are no conditions. I don't know whether the government might concede that in this case for a person who's never been arrested, who's only charged with forwarding $2,400 to keep him in pretrial custody for a period of more than three years. He's been in since August 31st. We have not seen one shred of classified material in this case, and the case is likely to go on for many years. Now, there was some evidence that your client destroyed or disposed of a cell phone when his co-conspirators were arrested. Could you address that? I wish we knew exactly what happened, but he, in fact, he, the government alleges that he got rid of his cell phone and said, well, I didn't know what they were up to, and I can certainly understand somebody's friends getting arrested for serious terrorism charges and not wanting to talk to them in the future, and knowing that he had conversations with them throwing out that cell phone. I don't know that we can characterize it. He could, in his mind, see it as obstruction or destruction of evidence, but that's the government's allegation. Curiously, we haven't seen one shred of the classified material. How long after the co-conspirators were arrested was your client arrested? Well over a year, and Mr. Kusanoff knew this. He spoke with the FBI voluntarily. It was, I think, 18 months after some of the co-conspirators were arrested. He didn't flee in that period. He voluntarily made statements to the FBI. He gave them access to his cell phone and another computer that weren't on a search warrant that the FBI had executed. So he's been cooperative in some respect, which balances out that he threw away his cell phone for sure. Thank you. I'll reserve the balance of my time for rebuttal, Judge. Thank you. May it please the Court, David Kessler and Joanne Navickas for the United States. The district court did not commit clear error here, and that's the question today, not whether there might be . . . But was this paying a danger to his community? Yes, that is the argument the government made. It's what the district . . . How? Explain how. He was a member of a network that supported ISIS and al-Nusra Front for multiple years. And the community is what? The community is at least the United States. Funding individuals who seek to travel to Syria to engage in violent jihad creates a danger. And even if the specific traveler who in this specific case was arrested at the airport intended to travel to Syria rather than to stay in New York, that doesn't show that there is no danger to the community here. Individuals return from Syria to the United States, and individuals who support those individuals seeking to wage violent jihad pose a threat to the community here. Well, you know, when I was on the district court, I had a case, United States versus Gotti, Jr. And we had him who was the titular head of this crime family and nineteen Gambino capos. And the government in that case conceded that there were, with respect to every single one of them, there were conditions of release. Yes, I believe that is what happened in that case, but that's not this case. This case involves a violent terrorist organization and individuals who are supporting that terrorist organization, a terrorist organization that has shown an interest and a willingness and a dedication to committing attacks in the United States and in Syria against U.S. and coalition forces. That wasn't the case in the Gotti case. Well, wouldn't you concede that, you know, and I don't want to gainsay for a moment the seriousness that ISIS posed, but in the panoply of conduct that might help ISIS, this is pretty far toward one end of the spectrum. I wouldn't concede that. I can imagine many worse things that someone could do. But funding individuals who want to go fight for ISIS is a bad thing. He bought a man a ticket, right? And the money for the ticket was bundled, right? So how much did he actually contribute? I don't remember if it's $200 or $400. It's in the detention memos. So $200? Is that what he contributed? That is the, I believe that's the specific amount that he himself contributed for this particular bundle. That's all he's charged with, right? So it's $200 contribution. He's charged with attempting and conspiring to support ISIS over roughly a year period. The specific incident that has been the discussion, you know, arising out of this bail appeal is the effort of one of the co-conspirators to travel to Syria in, I think, March. And he gave him $200? Well, he contributed, it was either two or both. How much did he contribute? I just don't remember the exact number. What's the order of magnitude? Do you recall that? I believe it's under $1,000. The entire $2,400 did not all come from his specific bank account. He helped, you know, bundle and then transferred that money. Let me pursue with you what you think the danger is. I mean, I could understand if you were coming to us and saying, look, not having succeeded in having sent this would-be ISIS fighter over to Syria, we're concerned that this guy is going to blow himself up in a shopping center. But I don't understand the government to be saying that. Do you have reason to think that his criminal conduct that he's charged with would lead him to engage in violence or support the violent conduct of others here in the United States? I understood from your answer to Judge Parker that you're looking at the United States as the community and not abroad, which I'm surprised at. But why don't you tell me what you think the danger is? What will he do if he's out that he couldn't do in? Let me say a couple of things. The first is, the community is not just the United States. I'm just saying we shouldn't- What, the world? Well, it's at least Syria and the United States. Sorry? It's at least Syria where the fighters were going and the United States, which is where this group is. Why don't you answer my question? Then we'll get into how to look at the community. No, no, but I think you've changed your position some. But tell us how you think he's a danger, whatever the community is. Sure. Let me say, to answer your question, let me just say one thing, though. This court can affirm on the risk of flight alone, so I just want to make sure we're not failing to address that. So the danger is that this is an individual who is supporting those willing to commit violent acts on behalf of ISIS. We have not said in the detention memos or in the argument before the district court that this particular individual- in the United States. We haven't said that. We haven't relied on that fact. So I think that's the record before this court. So you're not asserting that. Is that right? I'm certainly not asserting that today for these purposes. So hopefully that answers part of the question. And then I think there's sort of a broader question about the community. You know, the attacks in Syria are- or the jihad in Syria certainly threatens U.S. soldiers and U.S. coalition allies. Our president said last week that the battle against ISIS in Syria had been won and he's bringing the troops home. I guess I'm aware of that statement. You know, there certainly wasn't something considered by the district court. There certainly, at the time of this analysis and ongoing, there are coalition forces and U.S. forces in Syria. ISIS has taken credit for attacks in the United States. It remains a designated foreign terrorist organization. So I think that's the record. That's the evidence or certainly the evidence we're relying on with respect to the danger to the community. And then with respect to risk of flight, there are all the evidence that the district court and the parties have discussed. ...to his community quite substantial. He's got three kids. He's got a wife. You'll have his passport. You'll have their passport. If this man leaves the country, he'll never see any of them again. Well, so we're not denying that he has ties to, I guess, at least Chicago. I don't believe it's true that he'll never see his family again. Certainly his family can just go to wherever he is. As the government noted in its- How do you travel without a passport? The family could travel. In my hypothetical, you take their passports, too. Individuals can obtain fake documents. People flee even when they've surrendered their passports. Wasn't he in the process of obtaining citizenship? I believe that's correct. He was a legal permanent resident. For a lengthy period of time. That's right. This is not a case where we're saying the defendant had no ties to the community. This is a case where the other considerations outweigh those ties. Individuals flee when they've surrendered their passports. They can use fake documents. It's not on the record, but I currently have a case where there's someone who fled after he surrendered his passport. And, Mr. Carson, it's your view, on behalf of the government, that there is no combination of restrictions that will interfere with his possible fugitivity or protect the community. None that you can think of. That is the position we've taken. You've scratched your head about it, and you've thought about it, and you can't come up with any. Is that your position with us? Yes. The alternative considered by the district court and pretrial services involved home detention, GPS monitoring, surrender of a passport, surety, signing a bond. And there's nothing you can think . . . Excuse me. Let me be sure I understand why you're taking this position. Because you're telling us yes, but you don't explain why. And I want to be sure I understand, because then I want to allow Mr. Kaiser an opportunity to respond. Am I to intuit that the government's view is, given the nature of ISIS, which engages in particularly violent attacks, engages them planned, surprise, everything in between, and that no one who supports such an organization can be trusted not to further its terrorist activities? Is that the government's position? No. And that's not something the court . . . I would have thought so. So tell me what your position is. Well, I don't want to gauge in a hypothetical about someone who we could all construct might be trusted. No, no, no. I meant that whether it's with money or with other support, that someone who's committed to this kind of an ideological terrorist organization simply cannot be trusted not to continue to help it in its terrorist activities. I can't think of an example right now where at least I would say that that person could be trusted, but I don't want to make a completely . . . Why the government's view is that there are no conditions that can support release here? So in this particular case, the defendant faces extremely serious charges with an extremely long potential prison sentence. The weight of the evidence . . . I'm going through the factors. The weight of the evidence against the defendant is very strong. A portion of it has been laid out, especially in the government's second detention memo. The defendant has ties to areas of the world, as we laid out in the first detention memo, from which it would be functionally impossible to get him back. In that way, what do you mean functionally impossible? Well, there are countries from which it is easier or conceivable to extradite a fugitive, and then there are other countries where it might be a lot harder. I mean, it's virtually impossible to extradite from certain countries in the world, like Israel, for example. You can't extradite people from Israel. That's right, and so that is something a court can consider. And then the defendant has engaged in . . . But we can extradite people from his country of origin, right? We have an extradition treaty with them. I believe we have an extradition treaty with Uzbekistan, although I'm not sure. Right. With respect to? To Uzbekistan, I'm sorry. The existence of an extradition treaty does not, you know, fully answer the question of whether it would be feasible to extradite someone. The point is that's another . . . It's given your theory, right? It is a data point, yes. Do you provide for extradition of their own citizens? I just don't know. I'm sorry. You know, these are the kind of things that do matter. I mean, on the hierarchy, do you have an extradition treaty with the country? Yes or no. They have an extradition treaty. They extradite their own nationals or they don't. I mean, this is how we decide whether or not it's likely that he would be brought back to the United States. All right, anything else? I think at this point we'll rest on the papers we've submitted and the underlying papers. Thank you, Mr. Kaiser. You reserved a minute, but then you also had two, so we'll give you three. Thank you, Judge. Picking up where we just concluded, I've been arguing bail motions for years, and I've . . . for 30 years, and I've never had a client flee to avoid prosecution. I know it happens. It's been known to happen, but it's never happened to me. And so the government makes . . . your honors may have, but I've never had it happen. But we've used waivers of extradition where there are extradition treaties with a country, and he can execute that. Well, that . . . I mean, that applies to him, but whether the foreign country would honor it. I'm more concerned about the government's danger argument, and I don't know if Mr. Kessler and I were on the same wavelength. Why don't you tell me why the district court couldn't reasonably be concerned that having supported an organization such as ISIS for whatever amount . . . I mean, it is so troubling that one would support an organization such as ISIS, given their terrorist activities. He was supporting a plan abroad, but they've also acted in destructive ways here in the United States, that such a person simply cannot be trusted not to pose a danger. Why could the district court not conclude that? After all, this is a presumption case. So, the question is whether there are reasons to doubt the presumption. It is a presumption, Judge. But first, in this particular case, this particular defendant, I think the government alleges far, far more than his actual involvement in supporting ISIS, rather than just sending the money to an intermediary who sent it to somebody else. He wasn't going to wage jihad. He never made postings about jihad, about ISIS himself. . . . support someone else who is, and who's not going over simply to preach or distribute documents. I understand that the person who was being supported wanted to go over to fight ISIS. Of course, that is the allegation, Judge, and we actually dispute it. I understand, and that's the nature of the charge. So, the charge is favorable to your client in that, as you say, his involvement is not as personal or direct as some others. But nevertheless, the end result he was trying to achieve was for a human being to become an ISIS fighter. If we follow that line, Judge, all the way down, no 2239 defendant would ever be granted bail because this 2239 defendant is the least responsible in terms of supporting a theory of terrorism, sitting in his home and sending money to someone. I mean, what least level of support could there be? Certainly no danger in his past. You know, on another way of looking at it, and I'm not by any means suggesting this is your client, sitting in his home and funding or directing things is also what the head of an organization does. True. So, it's not always easy to say that these acts bespeak the lowest or the highest on the rung. But it naturally segues into Judge Parker's analysis of the capos and the mob cases where people are actually responsible for ordering the murders and have done great violence in the past. And those cases, those defendants have bail. They're entitled to bail. The difference is that theirs are targeted for whatever criminal objectives they have. Here, the nature of terrorism is to wreak havoc. And that's the danger. That's the difference here. I understand that, Judge. Moving on, I'd like to just briefly say $200 is the amount that I saw in the papers that he personally donated. $200 or $400, I'm not quite clear at this moment. So, that's about right. And lastly, I don't think this is a clearly erroneous standard where we assert the court failed to address the specific 3142 factors in sufficient weight. I think it's a plenary review subject to Shakur, Berrios, Berrios. It's a plenary review. If the district court didn't adequately consider the factors, we would remand for it to do so, right? We wouldn't necessarily admit your client to bail. We would remand. Your Honor could remand with instructions to set an appropriate bail. I'm having a little difficulty seeing, understanding the argument that the district court didn't consider the factors given our case law that says we generally presume that district courts are doing what they said. Is there anything else in this record other than the fact that the specific reports about the assurities were handed up at the last minute that leads you to that conclusion? Reading a prepared four-page statement into the record.  They stated their support of pretrial release. Judge Parker? In your papers, you cataloged a number of errors. You thought the district court made factual errors. Are you backing off of them? Not at all. The court actually made those errors. He, in fact, did not support multiple people's travel. He did not raise money for the purchase of weapons. He didn't leave posts espousing ISIS ideology on websites. So those are factual errors that the court made, and this court should consider that as part of its analysis. I looked at your assertions and what he had said and, you know, give it some thought, but it raised, in my mind, questions of the thoroughness or the intensity of the analysis. I mean, district court judges are busy. We certainly have been there, but . . . But in a case where a person is expected to spend the next three years in the MDC, in a serious high custody situation where we suggest the evidence is slim, there should be a detailed analysis. Thank you. When you say, just to ask you about the length of time you expect to trial, I mean, has no trial date been set so far? No trial date has been set, and we have not seen one shred of evidence from the . . . When is the government turning over discovery? Your Honor, the classified discovery, we worked out a clearance issue that was resolved a week or two ago. The next status conference is in May, and we anticipate turning over all or certainly the vast majority of the discovery in advance of that status conference. I'd like to weigh in on that. I'm sorry? Is the discovery material in English? Certainly there is extensive material in English. What about the other material? Is there material that's not in English? There may be some communications in Uzbek. It's been . . . What's the volume of the ones that are in Arabic? Sorry, I don't think it's Arabic. I think it's Uzbek. Oh, so you've got to get an Uzbekistan translate. The majority of the materials I'm informed are in Uzbek. They're in the secure room. We have an interpreter willing to go in. We've been approved. We've had security clearance for years, and we still have not been given any of the evidence. So it's not waiting for our security clearance. We thought that might have been the issue, but it's not. They just haven't turned over any of the secure information, and it's, for the most part, all in Uzbek, I'm informed. The legitimate concern when someone is detained is getting a trial as quickly as possible. Does the government expect that it's going to be three years to trial? No. How soon do you think the case can be tried? It depends on the review of the evidence by defense. Right, and, of course, counsel has the right to make motions and other things. But, I mean, how soon is all discovery going to be to the defense? I believe certainly the vast majority of it by May. If not all of it, there's a potential SEPA motion, which can take some time after the discovery is submitted. So I don't think we have a trial date in mind. I do not think it's three years from now at all. With all due respect, he's been in since August 31st, and we haven't seen one shred of classified material. Well, of course, we're not trying to set a schedule for you. It's just I wanted to get a little information about this. Thank you. We're going to take the appeal under advisement, and we'll try and get you a decision as quickly as possible. Thank you. Thank you, judges.